WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas Stewart, Jr., | No. CV 12-0719-PHX-RCB (LOA) |
| Plaintiff, | **O R D E R** |
| vs. | |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Thomas Stewart, Jr., brought this pro se civil rights action under 42 U.S.C. § 1983 against Dr. Karen Barcklay, an Arizona Department of Corrections (ADC) physician (Doc. 1). Before the Court are the following motions:

(1) Dr. Barcklay's Motion for Summary Judgment (Doc. 65);

(2) Stewart's Motion for Extension of Time to File Cross-Motion for Summary Judgment (Doc. 92);

(3) Stewart's Motion for Counsel (Doc. 93);

(4) Stewart's Cross-Motion for Summary Judgment (Doc. 96); and

(5) Dr. Barcklay's Motion to Strike Stewart's Cross-Motion (Doc. 97).

The Court will grant Dr. Barcklay's Motion for Summary Judgment and Motion to Strike, strike Stewart's Cross-Motion for Summary Judgment, and deny as moot Stewart's Motion for Extension of Time and Motion for Counsel.

## I.   Background

Stewart's claims arose during his confinement at the Arizona State Prison Complex-Yuma Complex (Doc. 1). He alleged that Dr. Barcklay was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment (*id.* at 16[1]). Stewart states that he suffers from spinal stenosis and disc degeneration and bulging (*id.* at 5). According to Stewart, Dr. Barcklay failed to consider his prior medical records; took away a cane he had used for seven years; refused to provide pain management shots; and discontinued his blood pressure medication, which resulted in Stewart's transfer to the hospital for treatment of high blood pressure and pain (*id.* at 9-13, 16).[2]

Dr. Barcklay filed a Motion for Summary Judgment arguing that (1) Stewart cannot show she was deliberately indifferent to his serious medical needs, (2) Dr. Barcklay is entitled to qualified immunity, and (3) Stewart's request for punitive damages should be dismissed (Doc. 65).[3]

On February 7, 2014, after Dr. Barcklay's motion was fully briefed, Stewart filed his Motion for Extension of Time to File Cross-Motion for Summary Judgment (Doc. 92). On February 18, 2014, he filed a Motion for Counsel (Doc. 93), and on March 3, 2014, he filed his Cross-Motion for Summary Judgment (Doc. 96). Dr. Barcklay filed her opposition to the Motions for Extension and for Counsel and moved to strike Stewart's Cross-Motion for Summary Judgment (Docs. 94-95, 98).

## II.   Pending Motions

Stewart's Motion for Extension to File Cross-Motion for Summary Judgment comes almost six months after the dispositive motions deadline, which was August 19,

---

[1] Citations refer to page numbers in the Court's Case Management/Electronic Case Filing system.

[2] The claims against Dr. Barcklay are set forth in Count II of Stewart's Complaint (Doc. 1 at 4). All other counts and Defendants were dismissed on screening (Doc. 12).

[3] The Court issued a Notice, required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998), informing Stewart of his obligation to respond to the summary judgment motion and the requirements under Federal Rule of Civil Procedure 56 (Doc. 67).

2013 (Docs. 64, 92). Stewart argues that he should be allowed to rebut Dr. Barcklay's reply arguments; however, Dr. Barcklay did not raise arguments in her reply that were not set forth in her Motion for Summary Judgment, to which Stewart responded. Even if she had raised new arguments in her reply, they would not be considered by the Court. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) (arguments raised for first time in reply brief are not considered). Stewart presents no grounds warranting an extension to the dispositive motions deadline, and he filed his Cross-Motion for Summary Judgment without leave. Consequently, his Cross-Motion is not authorized. Dr. Barcklay's Motion to Strike will therefore be granted, and the Cross-Motion will be stricken.

In light of this determination, Stewart's Motion for Extension and Motion for Counsel will be denied as moot.

The remaining motion is Dr. Barcklay's Motion for Summary Judgment (Doc. 65).

**III.   Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

**IV.    Relevant Facts**

The relevant disputed and undisputed facts are taken from Dr. Barcklay's Separate Statement of Facts (DSOF) (Doc. 66)[4] and Stewart's Separate Statement of Facts (PSOF) (Doc. 83).[5]

---

[4] The courtesy copies of Dr. Barcklay's DSOF and supporting exhibits are not printed from the Court's Case Management/Electronic Case Filing system—to reflect the page number—as required by the District of Arizona Case Management/Electronic Case Filing (CM/ECF) Administrative Policies and Procedures Manual.  *See* Manual § 2 ¶ D(3).  Defense counsel is notified that in the future, she must comply with all Local Rules of Civil Procedure and the CM/ECF Administrative Manual.  *See* LRCiv 83.1(f)(1)(A).

[5] Dr. Barcklay objects to PSOF on the grounds that it does not comply with Local Rule of Civil Procedure 56.1(b) (Doc. 91 at 1-2).  Although some of the paragraphs in PSOF do not correspond to the numbered paragraphs in DSOF, they set forth Stewart's factual assertions and establish disputes with DSOF.  In light of Stewart's pro se status and the requirement to construe his pleadings liberally and afford him the benefit of any doubt, the Court will overrule Dr. Barcklay's objection.  *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988).  Dr. Barcklay also "objects to paragraphs in the PSOF that are compound, conclusory, speculative, argumentative, self-serving, lacking foundation, hearsay, and irrelevant" (Doc. 91 at 3).  And she "objects to most of the Attachments to the PSOF [ ] because they are not admissible evidence," including unidentified statements within Stewart's declaration (Doc. 91 at 3-4).  These general objections are overruled.  The Court will only consider specific objections to identified paragraphs within PSOF and declaration and to specifically cited attachments/evidence (Doc. 71 at 3).  *See Reinlasoder v. City of*

Stewart's medical chart documents that in 2007, he received epidural steroid injections and between 2007 and 2010, he received pain medication injections for relief of back pain (DSOF ¶¶ 48, 62; PSOF ¶ 60). His chart also shows that at different times since 2007, Stewart has been issued Special Needs Orders for medical accommodations, including double mattresses, medical shoes, back braces, no behind-the-back cuffing, lower bunks, extra blankets, and no prolonged standing (DSOF ¶ 52). There is no record that Stewart was ever issued a Special Needs Order for a cane (*id.*).

Stewart was transferred to the Yuma Complex in June 2010 (DSOF ¶ 21). When he arrived at Yuma, he had a cane that the Maricopa County Jail issued to him in 2004 and he had since been permitted to keep (PSOF ¶¶ 14, 51; Doc. 83, Ex. A, Stewart Decl. ¶ 51).

On June 19, 2010, a few days after arriving at Yuma, Stewart submitted a Health Needs Request (HNR) asking to see a provider for his back problems (DSOF ¶ 21; PSOF ¶ 18). The Nurse who reviewed the HNR noted in Stewart's medical chart that he had a history of chronic low-back pain, congenital spinal stenosis and herniated disc, and that his prescribed medications included Elavil (antidepressant used to treat patients with chronic pain) and Triamterene/Hydrocholorothiazide (HCTZ) (for hypertension, i.e., high blood pressure) (DSOF ¶ 21). On June 20, 2010, Stewart refused a dose of Elavil due to the detrimental side effects caused by the medication (*id.* ¶ 22; PSOF ¶ 20).

Dr. Barcklay first saw Stewart on June 22, 2010 (DSOF ¶ 23; PSOF ¶ 21). She noted that his gait and balance were normal and he stood and walked easily (DSOF ¶ 23). She assessed him with chronic low-back pain; issued him a back brace; discontinued the Elavil and ordered Desiprimine for pain; renewed a prescription for Excedrin; and filled a prescription for HCTZ (*id.*; DSOF ¶ 24; PSOF ¶ 22).

---

*Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont. Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to permit the Court to rule"); *see also Halebian v. Berv*, 869 F. Supp. 2d 420, 443 n. 24 (S.D.N.Y. 2012) ("unsupported objection in entirely conclusory fashion to the entire record is insufficient and thus denied").

On or about July 1, 2010, security confiscated Stewart's cane (PSOF at 13 n. 6). According to the property seizure form, the cane was taken because it was "not authorized on unit" and there was no Special Needs Order for a cane (Doc. 83, Attach. 6 at 2-3 (Doc. 83-7 at 4-5)). Dr. Barcklay states that at some time prior to July 4, 2010, the security captain explained to her that because Stewart was found "carving" on his cane, it was confiscated, and she told him that she did not believe a cane was medically necessary for Stewart at that time (Doc. 66, Ex. A, Barcklay Decl. ¶ 52).

On July 3, 2010, Stewart refused a dose of Desiprimine because of side effects caused by the medication (DSOF ¶ 26; PSOF ¶ 24).

On July 4, 2010, Stewart fell on the sidewalk outside his dormitory; security staff initiated an incident command system, and Stewart was brought by wheelchair to medical and seen by nursing staff (DSOF ¶ 27; PSOF ¶ 25). He reported that his back goes out occasionally and that after this fall he experienced back pain, left leg numbness, left shoulder blade and neck pain, and a bump on the back of his head (DSOF ¶ 28; PSOF ¶ 26).[6] The nurse contacted a Physician's Assistant, who ordered 1-2 tablets of Darvocet 3x daily for 3 days and that Stewart's vital signs be checked every 2 hours for the next 12 hours (DSOF ¶ 28; PSOF ¶ 27). The nurse gave Stewart orders for ice, no-work status, a lower bunk for 3 days, and food tray/meal assistance (*id.*). Stewart was also issued one crutch (DSOF ¶ 30; PSOF ¶ 29).

The next day, Stewart reported to medical to pick up his Darvocet, at which time the nurse noted that he was able to bend down and pick up items from the floor without

---

[6] In part of DSOF ¶ 29, Dr. Barcklay states that an unidentified nurse noted in the July 4, 2010 medical record that unidentified security personnel reported to her a statement Stewart allegedly made to another inmate about his fall as well as an observation security made prior to Stewart's fall (DSOF ¶ 29; Doc. 66, Ex. A, Barcklay Decl. ¶ 28; Attach. 2 at 9-10). Stewart objects to this portion of DSOF ¶ 29 on the grounds that it is unsupported by affidavits and is hearsay (PSOF 28, 53). Stewart's objection is sustained. The statement within the medical record is double hearsay and it does not fall within the hearsay exception for medical records/statements. *See* Fed. R. Evid. 803(4) (statements made for medical diagnosis or treatment or describing medical history, symptoms, or sensations are not excluded by hearsay rule). Regardless, Stewart avers that this portion of DSOF ¶ 29 is untrue and, on Dr. Barcklay's motion, Stewart's facts and evidence are taken as true (PSOF ¶ 28). *See Anderson*, 477 U.S. at 255.

- 6 -

any apparent problems or pain complaints (DSOF ¶ 30).  Stewart states that this was because the Darvocet was working (PSOF ¶ 30).

On July 7, 2010, Dr. Barcklay ordered that nursing staff discontinue Stewart's Desipramine prescription for pain since he was refusing to take it (DSOF ¶ 32).  Also on July 7, 2010, Stewart saw nursing staff for follow-up related to his fall (*id.* ¶ 33).  He reported fairly severe pain in his lower back and left shoulder and that he had been doing okay until his cane was confiscated, and he expressed concerns about falling in the future without a cane or crutch (*id.*; PSOF ¶ 32).  Stewart was not wearing his back brace at the appointment because he does not need it when sitting or walking short distances (PSOF ¶ 32).

Dr. Barcklay saw Stewart again on July 13, 2010, and documented his blood pressure at 108/88 and his weight at 165 pounds (DSOF ¶ 35).  Stewart complained of low back pain and neck pain but only wanted to talk about his cane (*id.*; PSOF ¶ 34).  Dr. Barcklay noted he had full range of motion with his spine, no muscle tightness or deformity in the left shoulder, and no spasms, and he moved around without difficulty or evidence of pain (DSOF ¶ 35).  She assessed chronic low back pain (*id.*).

On July 19, 2010, Stewart had an x-ray of his left shoulder (DSOF ¶ 37).  The radiologist reported minor degenerative findings in the "AC" joint (*id.*).

On July 24, 2010, Stewart submitted an HNR requesting his cane and to see the provider and stating he had severe pain in his left shoulder as well as back and neck pain (DSOF ¶ 38).  He also requested that the provider order his prior medical records from another facility in the hopes that would help the provider with his care (*id.*).

Around this time, Stewart was observed ambulating around the yard (DSOF ¶ 40).  Stewart states his neurologist had recommended that he walk as much as possible every day, and he avers that daily walking helps reduce his back pain (PSOF ¶¶ 39, 58).

On August 21, 2010, Stewart submitted an HNR stating he had sharp pain under his right shoulder blade, and he was seen two days later by a nurse (DSOF ¶¶ 41-42).  His blood pressure was 158/84, and it was noted that he ambulated slowly and the right side

of his back was tender but there was no bruising or discoloration on his back and his range of motion was good (DSOF ¶¶ 41-42; PSOF ¶ 41).

The next day, Stewart submitted two HNRs—one requested a refill of his high blood pressure medication, HCTZ, and the other requested a refill of Excedrin (*id.* ¶¶ 43-44: PSOF ¶ 42). Stewart's last HCTZ prescription had expired on July 5, 2010 (DSOF ¶ 43).

Dr. Barcklay saw Stewart again on September 9, 2010, at which time his blood pressure was 138/80 (DSOF ¶ 45). Because Stewart had not taken HCTZ since the end of June, and Dr. Barcklay thought his blood pressure might have decreased due to a weight loss, she ordered biweekly blood pressure checks to determine whether he still needed high blood pressure medication (*id.*). After reviewing the blood pressure checks two weeks later and finding it within normal limits, Dr. Barcklay advised Stewart that he no longer needed blood pressure medication (*id.* ¶¶ 45, 72). Dr. Barcklay also ordered an outside consult for a spine x-ray, which was approved, and Stewart was scheduled for the x-ray on November 19, 2010 (*id.* ¶ 71).

Meanwhile, on October 24, 2010, Stewart submitted an HNR requesting a refill of his Excedrin prescription because he was almost out; the response informed him there were "no refills," and that he was scheduled to see the provider on November 14, 2010 (*id.* 74 &Attach. 3 at 14).

On November 14, 2010, Stewart reported to medical and indicated that he was out of pain medication and in terrible pain (DSOF ¶ 75). The nurse reminded him he had no more Excedrin refills and she offered him ibuprofen, which he declined, so she provided him Tylenol 325 mg. (*id.*).

The next day, Stewart walked to medical and complained of back pain; the nurse issued him Tylenol (*id.* ¶ 76).

Dr. Barcklay saw Stewart for a fourth time on November 18, 2010 (*id.* ¶ 77). His blood pressure was recorded as 142/76, and she noted he was in no apparent distress, his gait and balance were normal, and he stood and walked easily (*id.*). Dr. Barcklay

assessed low back pain and ordered a prescription for Excedrin with three refills in six months (*id.*). Stewart indicated he wanted the higher number of pills that were in his prior prescription, and he refused to leave until escorted out by security (*id.*).

On November 19, 2010, Stewart was transported off site for his spine x-ray (*id.* ¶ 78).

On December 19, 2010, Stewart submitted an HNR seeking a refill of his Excedrin; this HNR request was forwarded to the pharmacy (*id.* ¶ 79). He submitted another HNR Excedrin-refill request on January 19, 2011, which was also sent to the pharmacy (*id.* ¶ 81). On March 10, 2011, he submitted another HNR requesting a refill of Excedrin; this was also sent to the pharmacy and, apparently, resent again on April 14, 2011 (*id.* ¶ 84).

On April 15, 2011, a nurse called Dr. Barcklay and informed her that Stewart reported to medical with back pain and spasms in his lower back and that he wanted a pain shot (*id.* ¶ 85). Dr. Barcklay directed the nurse to provide him with Tylenol 650 mg but to caution him not to take it with his Excedrin because they both contain Tylenol (*id.*). The nurse also issued him a new back brace to replace his old, stretched out one (*id.*).

On July 25, 2011, Stewart submitted HNRs seeking to have his old medical records available at his next provider appointment and inquiring about his Excedrin prescription that expired on April 18, 2011 (*id.* ¶ 86).

On July 28, 2011, Stewart went to medical complaining of severe back pain, and he was seen by a nurse (*id.* ¶ 87). The nurse noted that he had an unsteady gait, he urinated three times in 40 minutes, and he was hunched over and using appliances to support himself when he walked (*id.*). Also noted were his repeated elevated blood pressure levels of 160/109 (*id.*). The nurse contacted ADC physician Dr. Rowe, who ordered that Stewart's blood pressure be monitored for 2 weeks and he be given Enanapril and hydrochlorothiazide (blood pressure medications) daily (*id.*). The nurse also gave Stewart a crutch (*id.*).

1    Shortly after midnight on July 29, 2011, Stewart was transported to the Yuma Regional Medical Center (*id.* ¶ 89). Dr. Barcklay states that hospital transport was for his low back pain; Stewart states it was for high blood pressure and low back pain (*id.*; PSOF at 29-30 n. 12). At the hospital, Stewart was given Dilaudid (a narcotic pain medication) and Phenergan (an anti-nausea medication), and he returned to the prison with a prescription for Lortab, a narcotic pain medication (DSOF ¶ 89). The discharge instructions indicated a diagnosis of back sprain (Doc. 66, Ex. A, Attach. 4 at 6 (Doc. 66-1 at 138)).

    Dr. Barcklay saw Stewart on the morning of July 29, 2011, after he returned from the hospital (DSOF ¶ 92). His blood pressure was 120/72 (*id.*). He requested a renewal of Excedrin, and there are no notes in the record regarding hypertension or complaints about high blood pressure (*id.*). Stewart states that he had been put back on the hypertension medication as prescribed by Dr. Rowe so there was no need to address his hypertension (PSOF ¶ 85). Dr. Barcklay assessed low back pain, informed Stewart he would not be given any narcotic pain medications and refused to fill the Lortab prescription issued by the hospital physician, but she ordered Excedrin (*id.* ¶ 83; DSOF ¶ 92).

    On July 31, 2011, Stewart went to medical for back pain; he began yelling about his medical issues and threated to come to medical every day until his needs were met (DSOF ¶ 93; PSOF ¶ 86). He was escorted from medical by security (DSOF ¶ 93).

    Dr. Barcklay saw Stewart on August 16, 2011, at which time he was receiving Excedrin but he wanted a neurological consult and to know about other options to treat his back pain (DSOF ¶ 94). Stewart was wearing his back brace, and he walked easily with a normal gait (*id.*). Dr. Barcklay prescribed Nortiptyline, an antidepressant, which he later refused to take because it made him very sleepy and diminished his mental state (*id.* ¶¶ 95-96; PSOF ¶ 89). She also recommended continued daily exercise and yoga classes (DSOF ¶ 95).

Dr. Barcklay saw Stewart on September 1, 2011, at which time his blood pressure was 111/70 (DSOF ¶ 97).

## V. Discussion

### A. Governing Standard

Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. The state of mind required for deliberate indifference is subjective recklessness; however, "the standard is 'less stringent in cases involving a prisoner's medical needs . . . because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (*quoting Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). While the obviousness of the risk is not conclusive, a defendant cannot escape

1   liability if the evidence shows that the defendant merely refused to verify underlying
2   facts or declined to confirm inferences that he strongly suspected to be true. *Id.*

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown by the way in which prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003). And deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### B. Serious Medical Need

Dr. Barclay does not argue that Stewart's conditions did not constitute serious medical needs (*see* Doc. 33). Also, there is no dispute that Stewart's back and hypertension conditions were documented, he was regularly treated and prescribed medications, and he was taken to the hospital for emergency treatment. *See McGuckin*, 974 F.2d at 1059-60.

On this record, a jury could find that Stewart's condition constituted a serious medical need.

### C.     Deliberate Indifference

With respect to the initial question on the deliberate-indifference prong—whether Dr. Barcklay had the requisite knowledge of a substantial risk of harm—there is no argument that she was not aware of Stewart's medical conditions and need for treatment. In her declaration, she establishes that she was Stewart's treating physician, she assessed him with chronic low back pain and regularly prescribed medication for this condition, and she was aware of his hypertension history and medications (Doc. 66, Ex. A, Barcklay Decl. ¶¶ 1, 19, 21-22, 34, 44, 85, 87 (Doc. 66-1 at 2-25)).

As mentioned, Stewart alleges that Dr. Barcklay was deliberately indifferent as evidenced by her responses to his serious medical needs; namely, she failed to consider his prior medical records, she took away his cane, she failed to approve pain management shots, and she improperly discontinued his high blood-pressure medication (Doc. 12 at 16).

#### 1.  Back Condition

Dr. Barcklay avers that she considered Stewart's previous medical history and was aware of prior treatments he received for his back condition (Doc. 66, Ex. A, Barcklay Decl. ¶¶ 47-48 (Doc. 66-1 at 13)). She asserts that as a physician, she considers many factors when evaluating and treating a patient: a review of the patient's overall medical history, what the patient tells her, and her observations of the patient (*id.* ¶¶ 45-46 (Doc. 66-1 at 12-13)). Stewart alleges that Dr. Barcklay does not listen to her patients or sufficiently review records, and points out that she failed to provide treatment that was successful in the past, including pain-management shots, specialist care, and MRIs (Doc. 84 at 12).[7] But this conclusory allegation is insufficient to overcome summary judgment.

---

[7] Stewart seeks to rely on an Arizona Medical Board Letter of Reprimand relating to Dr. Barcklay's treatment of another prisoner in 2005 (Doc. 83, Attach. 7, Ex. D (Doc. 83-8 at 34-43)). Dr. Barcklay objects to this evidence on the basis that it lacks foundation or relevance, is hearsay, is unsupported, and falls outside the time frames of this case

- 13 -

*See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The record shows that Dr. Barcklay was aware of Stewart's medical history, complaints, and desired treatments; thus, evidencing that she listened to Stewart (*see* Doc. 66, DSOF ¶¶ 21, 34, 47, 48 (in part), 49, 72, 85, 87).  That she did not provide the treatment Stewart preferred merely shows a difference of medical opinion, which does not support an Eighth Amendment claim.  *Jackson*, 90 F.3d at 332.  The Court also agrees with Dr. Barcklay's suggestion that Stewart's chronic back condition was not fixed and could change over time (*see* Doc. 66, Ex. A, Barcklay Decl. ¶ 45 (Doc. 66-1 at 12-13)).  Indeed, Stewart's evidence includes the deposition of Dr. Abhay Sanan, a Tucson neurosurgeon who treated Stewart in 2006 and who testified that back pain, even chronic pain associated with spondylitic disease and spinal stenosis—like Stewart has—typically ebbs and flows or comes and goes (Doc. 83, Ex. A, Attach. 2, Sanan Dep. 5:9-11, 22:1-7, March 6, 2008 (Doc. 83-3 at 26, 30)).[8]  As such, a specific treatment Stewart received in 2006-2008 for back pain may not have been appropriate in 2010-2011, and Dr. Barcklay's medical decisions regarding

---

(Doc. 91 at 4-5).  The Court sustains the objection.  Because the Letter of Reprimand is a public record, it is not hearsay.  Fed. R. Evid. 803(8).  However, Stewart fails to establish that he seeks to use this evidence other than to show Dr. Barcklay acted in conformity with her prior act.  *See* Fed. R. Evid. 404(b)(1)-(2).  Stewart also fails to show that the prior bad act is sufficiently similar to the alleged violation in this case—the 2005 incident was an emergency situation involving an inmate's blunt head injury whereas here, Dr. Barcklay treated Stewart for chronic conditions over a substantial period of time.  *See United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008) (evidence admissible under 404(b) if, among other factors, the prior act is similar to the alleged offense at issue).

[8] Dr. Barcklay objects to Dr. Sanan's deposition testimony, taken in a prior action Stewart brought against a detention officer, on the grounds that it is not relevant and constitutes hearsay (Doc. 91 at 4, 6; *see* Doc. 83-3 at 25-26).  The objection is overruled.  A declaration may be used to support or oppose a summary judgment motion if it meets the requirements for an affidavit under Rule 56, i.e., it is made on personal knowledge and sets out facts that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(4); *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966 (9th Cir. 1981); *see Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) (deposition testimony taken in a separate proceeding involving different parties may be used at summary judgment).  Dr. Sanan's deposition meets the Rule 56 requirements; thus, it is not hearsay, and portions of his testimony concern Stewart's back condition, which is relevant to this case.  *See* Fed. R. Civ. P. 56(c)(4).

1 treatment were based primarily on Stewart's presentation of symptoms and pain at the
2 time relevant time.

3       For these reasons, the Court finds no material disputed facts as to whether Dr.
4 Barcklay failed to consider Stewart's prior medical records or improperly denied pain
5 management shots to treat his back condition.  To the extent that Dr. Barcklay's treatment
6 may not have been successful or was even negligent, negligence or even gross negligence
7 does not violate a prisoner's Eighth Amendment rights.  *See Wood v. Housewright*, 900
8 F.2d 1332, 1334 (9th Cir. 1990); *Broughton v. Cutter Laboratories,* 622 F.2d 458, 460
9 (9th Cir. 1980).  Dr. Barcklay's request for summary judgment on these two claims will
10 be granted.

11       With respect to Stewart's allegation that Dr. Barcklay took away his cane, the
12 evidence establishes that Stewart was permitted to use a cane for years prior his transfer
13 to Yuma (Doc. 83, Ex. A, Pl. Decl. ¶ 51); thus, the fact that there was no official Special
14 Needs Order authorizing a cane is of no moment.  The evidence further establishes that
15 although security confiscated the cane, it was Dr. Barcklay's decision that it would not be
16 returned to him (Doc. 66, DSOF ¶ 53 (in part)).  Consequently, the Court rejects Dr.
17 Barcklay's claim that she had no personal involvement with Stewart losing access to a
18 cane (*see* Doc. 65 at 12).

19       Dr. Barcklay avers that she did not believe Stewart had a medical need for a cane
20 because she observed him walk and move around without difficulty or evidence of pain,
21 and his gait and balance were normal (Doc. 66, Ex. A, Barcklay Decl. ¶¶ 52 (in part), 54
22 (Doc. 66-1 at 14-15)).  Stewart himself maintains that daily walking helps reduce his
23 back pain and that various doctors advised him to walk regularly (Doc. 83, Ex. A, Pl.
24 Decl. ¶¶ 39, 58; Attach. 2 (July 7, 2011 hospital med. record advising Stewart to take
25 walks as treatment for back pain)).  Even though the record shows that Stewart fell
26 without a cane on July 4, 2010, his own evidence suggests that his fall was caused, at
27 least in part, by a six inch "pop[p]ed-up sidewalk that ADC failed to give attention to[]"
28

1  (Doc. 83, PSOF ¶ 26 & Ex. A, Attach. 2 (Doc. 83-3 at 43)).[9]  In addition, there is no
2  evidence that he has fallen again since, and there is no dispute that on occasion Stewart is
3  provided a crutch to help ambulate when necessary (Doc. 66, DSOF ¶¶ 30, 87; Doc. 83,
4  PSOF ¶ 29).

5  The Court finds that Dr. Barcklay's decision not to authorize a cane for Stewart
6  was medically reasonable under the circumstances.  Stewart has established his
7  conflicting opinion on the necessity of a cane; however, again, a difference of opinion
8  concerning the appropriate course of treatment does not amount to deliberate
9  indifference.  *Jackson*, 90 F.3d at 332.  Stewart fails to show that Dr. Barcklay's decision
10 was "medically unacceptable under the circumstances," or that her course of treatment
11 was chosen "in conscious disregard of an excessive risk to [Stewart's] health." *Id.*
12 Accordingly, summary judgment will granted to Dr. Barcklay on this claim.

### 2. High Blood Pressure

The last allegation against Dr. Barcklay is that she improperly discontinued Stewart's hypertension medication and, as a result, he had to be taken to the hospital for emergency treatment.

Dr. Barcklay states that she reviewed Stewart's blood pressure readings after he did not receive a medication refill in July 2010, and she noted mostly normal levels and few elevated values (Doc. 66, Ex. A, Barcklay Decl. ¶ 68 (Doc. 66-1 at 19)).  After monitoring his blood pressure for two more weeks and finding readings within the normal range, and considering that he reported weight loss down from over 200 pounds, she determined that he no longer needed hypertension medication (*id.* ¶¶ 68-70).  Dr. Barcklay asserts that for the next 10 months, Stewart's blood pressure was not hypertensive, and it was not until July 2011—one year after discontinuing hypertension medication—that he went to the hospital (Doc. 65 at 14-15; DSOF ¶ 88).  Stewart does

---

[9] Stewart states that he requested the video recording of his fall because it would show that the sidewalk was pushed up (Doc. 83, Ex. A, Pl. Decl. ¶ 26).  Apparently, he did not receive the video, and he states that the sidewalk was then fixed "to cover it up" (*id.*).

- 16 -

not refute of any these facts or assertions by Dr. Barcklay, and he confirms that he had lost weight (Doc. 84 at 15).

As to the dispute over the reason for Stewart's emergency room visit in July 2011, there is evidence to support both parties' claims. As noted by Dr. Barcklay, the hospital medical record makes no mention of treatment for hypertension and reports only a back sprain diagnosis (Doc. 66, Ex. A, Attach. 4 at 6 (Doc. 66-1 at 138)). But, as noted by Stewart, the prison medical record shows that just prior to the hospital transport, his blood pressure readings were elevated when taken 4 times over a 1 and 1/2 hour period and the nurse's remarks indicate concern over these readings (*id.*, Attach. 2 at 20 (Doc. 66-1 at 79)). The record also reflects that Stewart was immediately placed back on hypertension medications in response to the elevated levels (*id.*).

When making an inference in Stewart's favor and assuming that the elevated blood pressure readings contributed to the medical emergency, it nonetheless is insufficient to establish deliberate indifference by Dr. Barcklay. Her decision to discontinue the medication was based on medical opinion and undisputed objective factors regarding Stewart's status at the time, i.e. continuous months of non-elevated blood pressure readings. The one-year delay between the cessation of medication and the July 2011 elevated readings militates against finding that the lack of medication caused Stewart's hypertension flare up. And there is no dispute that throughout that one-year period, Stewart's blood pressure was regularly monitored.

In sum, as with his claim related to the cane, Stewart fails to show that Dr. Barcklay's decision to discontinue medication in 2010 was medically unacceptable or that she made this decision in conscious disregard of a risk to Stewart's health. *See Jackson*, 90 F.3d at 332. Summary judgment is therefore appropriate on this claim. Dr. Barcklay's motion will be granted, and the Court need not address the remaining arguments.

//

//

**IT IS ORDERED**:

(1) The reference to the Magistrate Judge is **withdrawn** as to Dr. Barcklay's Motion for Summary Judgment (Doc. 65) and Motion to Strike (Doc. 97), and Stewart's Motion for Extension of Time to File Cross-Motion for Summary Judgment (Doc. 92), Motion for Counsel (Doc. 93), and Cross-Motion for Summary Judgment (Doc. 96).

(2) Dr. Barcklay's Motion to Strike (Doc. 97) is **granted.**

(3) Stewart's Cross-Motion for Summary Judgment (Doc. 96) is **stricken**.

(4) Stewart's Motion for Extension (Doc. 92) and Motion for Counsel (Doc. 93) are **denied as moot**.

(5) Dr. Barcklay's Motion for Summary Judgment (Doc. 65) is **granted**, and the Complaint is dismissed with prejudice.

(6) The Clerk of Court must enter judgment accordingly and terminate the action.

DATED this 25th day of March, 2014.

_____
Robert C. Broomfield
Senior United States District Judge